**Barbara HERTZ, an individual,**
**Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT**
**INSURANCE COMPANY,**
**Defendant.**

**No. 3:12–CV–00141–LRH–RAM.**

United States District Court,
D. Nevada.

Jan. 10, 2014.

Jess P. Rinehart, Vernon E. Leverty, William Ginn, Patrick R. Leverty, Leverty & Associates Law, Chtd., Reno, NV, for Plaintiff.

Keith A. Weaver, Lewis Brisbois Bisgaard & Smith, Las Vegas, NV, for Defendant.

## ORDER

LARRY R. HICKS, District Judge.

Before the Court is Defendant Hartford Life and Accident Insurance Company's ("Hartford") Motion for Summary Judgment. Doc. # 50.[1] Plaintiff Barbara Hertz ("Hertz") filed a Response (Doc. # 57), to which Hartford replied (Doc. # 58). Also before the Court is Hertz's Motion for Judgment Under Federal Rule of Civil Procedure 52. Doc. # 52. Hartford filed a Response (Doc. # 55), to which Hertz replied (Doc. # 60).

## I. Introduction

This is an action for long term disability ("LTD") benefits pursuant to the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, brought by Hertz against Hartford. The suit stems from Hartford's alleged wrongful termination of Hertz's LTD benefits. Hertz commenced this action on March 15, 2012, after exhausting all administrative remedies required under ERISA. Doc. # 1. On May 9, 2012, Hertz filed a First Amended Complaint ("FAC"). Doc. # 10. On June 27, 2013, Hartford filed the present Motion for Summary Judgment. Doc. # 50. On June 28, 2013, Hertz filed the present Motion for Judgment Under Federal Rule of Civil Procedure 52. Doc. # 52.

## II. Findings of Fact

"In bench trials, [Federal Rule of Civil Procedure] 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" *Vance v. American Hawaii Cruises, Inc.,* 789 F.2d 790, 792 (9th Cir.1986) (quoting F.R.C.P. 52(a)). The following constitutes the Court's findings of fact based on the Administrative Record ("AR"), the parties' uncontested admissions, and extrinsic evidence submitted with the Motions presently before the Court.

### A. Hertz's Long Term Disability Coverage Under The Plan

At all relevant times, Hertz was employed by Intuit, Inc. Doc. # 10, ¶ 5; Doc. # 11, ¶ 5. As a result of her employment, Hertz was, and continues to be, a participant in The Group Long Term Disability Plan (the "Plan"), an employee welfare benefit plan regulated by ERISA. Doc. # 10, ¶ 6; Doc. # 11, ¶ 6; AR 000001–50. The Plan designates and names Hartford as the claims fiduciary for benefits provided under the policy. AR 000034, 37.

---

1. Refers to the Court's docket number.

Hartford both administers and pays benefits under the Plan. Doc. # 10, ¶ 12, ¶ 16; Doc. # 11, ¶ 12, ¶ 16. Hartford also has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [the Plan]." AR 000019. The Plan provides LTD benefits equal to 66 2/3 percent of the participant's pre-disability income if the participant meets the Plan's definition of "Disability" and remains disabled through a 180–day elimination period. AR 000008–10. In order to qualify for LTD benefits, a participant must provide proof of his or her disability as defined by the Plan. AR 000018. The Plan provides that benefits will be terminated when a participant no longer meets the definition of "Disabled" or when a participant fails to provide proof of his or her disability when requested by Hartford. AR 000011. "Disability" or "Disabled" is defined in the Plan as follows:

during the Elimination Period and for the next 24 months [the participant is] prevented by:

1. accidental bodily injury;
2. sickness;
3. Mental Illness:
4. Substance Abuse; or
5. pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.

AR 000020. "Essential Duty" is defined as "a duty that: 1. is substantial, not incidental; 2. is fundamental or inherent to the occupation; and 3. can not be reasonably omitted or changed." AR 000021. The Plan applies a "Your Occupation" definition of "Disability" for the first 24 months. AR 000020. Thereafter, the more stringent "Any Occupation" definition of "Disability" applies. AR 000020. "Any Occupation" is defined as "an occupation for which you are qualified by education, training or experience, and that has an earning potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." AR 000020.

On October 13, 2006, Hertz stopped working as a Customer Service Manager at Intuit, Inc. due to lumbar degenerative disc disease and cervical degenerative disc disease. AR 000069, 561. On March 14, 2007, Hartford approved Hertz's claim for LTD benefits. AR 000051–53. Hartford determined that Hertz's condition, limitations, and restrictions prevented her from performing the material duties of her own sedentary occupation. Doc. # 10, ¶ 29; Doc. # 11, ¶ 29. Periodically thereafter, Hartford re-evaluated Hertz's claim and requested supplemental information from her physicians. AR 000494–552, 581, 582.

On June 18, 2007, Hartford informed Hertz that she would be required to apply for Social Security Disability ("SSD") benefits. AR 000055–56. Hertz applied for SSD benefits and the Social Security Administration ("SSA") determined that she was disabled as of October 16, 2006. AR 000057–60. On February 6, 2008, Hertz informed Hartford that she had been awarded SSD Benefits in the amount of $1,064 per month. AR 000541. On February 13, 2008, Hartford informed Hertz

that it had overpaid her in the amount of $9,680.16 based on her receipt of SSD Benefits. AR 000063–64. Hartford also informed Hertz that her net monthly benefit would be reduced to $1,248.89 based on the offset from her monthly receipt of SSD Benefits. AR 000063–64. Thereafter, Hertz repaid to Hartford the total amount of overpayment due to her receipt of SSD Benefits. AR 000539–40.

On November 13, 2008, Hartford notified Hertz that the first twenty-four (24) months of her LTD benefits, during which time her "Disability" was evaluated by reference to "Your Occupation," was set to expire on April 21, 2009. AR 000575–576. Hartford further advised Hertz that it would be initiating an investigation to determine if she qualified for LTD benefits under the more stringent "Any Occupation" definition of "Disability." AR 000575–576. Finally, Hartford requested that Hertz and her treating physician complete and return several forms related to her disability. AR 000575–576. On April 10, 2009, Hartford sent a letter to Hertz advising her that she met the "Any Occupation" definition of "Disability" and would continue to qualify for benefits on or after April 21, 2009. AR 000565.

Regularly thereafter, Hartford re-evaluated Hertz's claim and requested supplemental information from her treating physicians. AR 000406–512, 563, 564. These re-evaluations included reports from Hertz's treating family physician Dr. Green, treating neurosurgeon Dr. Morgan, treating neurologist Dr. Quaglieri, treating neurosurgeon Dr. Bigley, and treating Advance Practice Nurse ("APN") Murphy. AR 000406–520. At least until November 2010, the record consistently reflects that Hertz's condition, including diagnoses of

cervical degenerative disc disease and lumbar degenerative disc disease, as well as her restrictions and limitations, were medically supported. AR 000406–520. Additionally, in October 2010, Hertz filled out a claimant questionnaire wherein she indicated that she had cramping in both legs making it impossible to walk or stand up at times, and cramping in her arms and legs from sitting for periods of time. AR 000447. She also indicated that in the last eighteen (18) months, her headaches had gotten worse, she had fallen several times because her left leg would not lift up all the way, and that she was experiencing numbness in her hands at most times. AR 000447. Finally, she indicated that she can no longer manage daily walks or exercise due to pain and limited range of motion. AR 000447.

### B. Hartford's Cancellation of Hertz's Coverage

On November 9, 2010, a Hartford examiner called Hertz for an interview, and someone other than Hertz answered the phone, stating that the number was for a business called "Doggie Diner." AR 000512. Hertz was unavailable to speak to the Hartford examiner at that time. AR 000512. Hartford claims that the phone call "raised a reasonable question about whether Hertz was working" and "called into question Hertz's functional capacities." Doc. # 50, ¶¶ 9, 10. Additionally, a database inquiry revealed that Hertz had posted a new menu for "Jim's Old Fashion Doggie Diner" on her Facebook page, that she was listed as the Secretary of the Fallon Lions Club, and that she had a tow truck registered in her name.[2] AR 000283. As a result, Hertz's claim was referred to Hartford's Special Investiga-

---

**2.** Hertz denies, and Hartford failed to offer any proof, that she ever had a tow truck registered in her name. *See* Doc. # 57, p. 3.

tion Unit ("SIU") for further evaluation. AR 000283, 509–510.

On November 22, 2010, Hartford hired HUB Enterprises, Inc. ("HUB")[3] to conduct surveillance on Hertz. AR 000283. In total, HUB surveyed Hertz for over forty-two (42) hours and obtained approximately eleven (11) minutes of video surveillance. AR 000292, 304. On December 7, 2010, HUB surveyed Hertz for ten and one half (10 1/2) hours, obtaining five (5) minutes and forty-nine (49) seconds of video. AR 000292; AR 000295–297 (documenting Hertz's activities driving to Wal–Mart, shopping at Wal–Mart, unloading grocery bags into her vehicle, driving to Jim's Doggie Diner, spending almost five (5) hours at the Diner, driving home, and retrieving her mail). On December 8, 2010, HUB surveyed Hertz for ten (10) hours, obtaining four (4) minutes and thirty-eight (38) seconds of video. AR 000292; AR 000298–300 (documenting Hertz's activities driving to the Diner, leaving the Diner almost two hours later, driving to a private residence, driving back to the Diner, carrying unidentified items into the Diner, and driving home). On December 22, 2010, HUB surveyed Hertz for twelve (12) hours, obtaining one (1) minute and thirteen (13) seconds of video. AR 000304; AR 000307–309 (documenting Hertz's activities driving to the Diner, carrying unidentified items into the Diner, and driving home approximately six hours later). On December 23, 2010, HUB surveyed Hertz for ten (10) hours, obtaining no video. AR 000304; AR 000309–310 (documenting that surveillance was maintained, but no subject activity was observed).

Because Hartford believed that the above surveillance revealed "inconsistencies" with respect to Hertz's stated level of function, Hertz's file was referred for a face-to-face interview. AR 000506. On February 28, 2011, Hartford Investigator Wayne Spencer conducted an in-person interview with Hertz at a restaurant. AR 000506. Investigator Spencer observed Hertz "to sit for 1 hour and 5 minutes" and "to ambulate with a noticeable limp." AR 000506. Hertz reported to Investigator Spencer the same functional limitations as had been previously documented. AR 000506. She also explained that the Diner "is solely her husbands and he does all of the work however she spends some time there to get out of the house." AR 000506. She further indicated that "her husband had another job and thus 4–5 hours a week [she] goes [sic] to ensure that the business is running properly." AR 000506.

At that time, Hartford also requested and received updated medical records from Dr. Quaglieri, Dr. Morgan, Dr. Green, and APN Murphy. AR 000506–507. On March 25, 2011, Hartford requested updated medical records from Dr. Quaglieri and Dr. Morgan. AR 000321; AR 000393. On April 19, 2011, Hartford requested updated medical records from Dr. Green and APN Murphy. AR 000390. Hartford Investigative Specialist Mari Gaston then referred Hertz's file to Medical Case Manager ("MCM"), Hartford Nurse Johanna Cobb, "to review medical records and investigative material as well as to help clarify [her] current level of function from her treating [physicians]." AR 000506–507. On May 20, 2011, Nurse Cobb performed an initial assessment, reviewing the surveillance video; Investigator Spencer's report from the unrecorded February 28, 2011 interview; medical records from Dr. Morgan through July 6, 2010; medical records from Dr. Quaglieri through July 10, 2010; medical records from APN Murphy through April 25, 2011; and historical Attending Physician Statements ("APS") from Dr. Morgan

---

**3.** HUB is a nationwide investigation firm. AR 000300.

through November 10, 2010. AR 000504. Nurse Cobb noted that "[a]lthough the medical information notes exacerbation of her pain, her lack of treatment with a Pain Management specialist or an Orthopedist does not support the severity of her complaints. Her statement including limited activity with sit, stand and walk is inconsistent with the activities on video where she remained away from her residence at her husband?s [sic] business for over 6 hours in 1 day and on consecutive days. Based on the inconsistencies, and no r/1 on file from any current provider, updated r/1 need to be obtained at this time." AR 000505.

On May 24, 2011, Nurse Cobb contacted Dr. Green, requesting clarification of Hertz's current maximum level of function in light of the December 2010 surveillance information and the February 28, 2011 interview. AR 000218. Specifically, she requested his medical opinion "from a Family Practice perspective" as to

> whether Mr. [sic] Hertz currently has the functionality to perform activity as follows: 40 hours per week, Primarily seated in nature, with occasional walking and standing and; allows for full use of the upper extremities. Lifting/carrying will be limited to 0–10 pounds on an occasional basis. Afforded will be the opportunity to change body positions/postures as needed for comfort (by walking, standing, or moving about). And she will be able to perform a variety of duties, utilize judgment and decision making, and attain precise set limits and standards.

AR 000218. On June 15, 2011, Dr. Green responded in the affirmative.[4] AR 000218. Hartford did not contact Dr. Morgan or Dr. Quaglieri with the same inquiry, citing the fact that Hertz had not seen either physician since July 2010. AR 000505. On June 16, 2011, Investigative Specialist Gaston noted that "[a]lthough the claimant opines that she is unemployable the surveillance and interview notate a higher level of function." AR 000501. Investigative Specialist Gaston then referred Hertz's claim to a Rehabilitation Case Manager ("RCM") to conduct an employability analysis review ("EAR"). AR 000501. EAR Analyst Marvin Bryant identified a number of appropriate occupations based on Dr. Green's agreement that "Ms. Hertz can work 40 hours per week in primarily seated work with occasional standing and walking; has full use of the upper extremities and lifting and carrying is limited to 0 to 10 pounds occasionally." AR 000496–498.

On June 29, 2011, citing medical records and video surveillance that notate a higher level of function, Investigative Specialist Gaston recommended terminating benefits effective July 2, 2011, "as [Hertz] no longer meets the definition of disability." AR 000496. On July 5, 2011, Hartford sent Hertz a letter terminating her LTD benefits, effective July 6, 2011. AR 000077–81. Hartford based its decision to terminate benefits on "all of the documents contained in [Hertz's] file," including but not limited to Hertz's claimant questionnaire, dated January 9, 2010; the aforementioned video surveillance, dated December 7, 8, 22, and 23, 2010; Hertz's "Continuing Statement

---

**4.** Subsequently, Dr. Green provided a letter and an office visit report clarifying his position that while Hertz could "sit and work in a sedentary job … for a day or two,[ ] she could never do this on a daily basis and she is unable to maintain any type of employment due to her disability." AR 000189–194.

Moreover, throughout Hertz's appeal he maintained that Hertz "has a radicular problem that probably makes [her] disabled" and that she "is considered unable to work, but purely from the internal medicine point of view, [she] is capable of doing sedentary work." AR 000158.

of Disability" made to Investigator Spencer, dated February 28, 2011; diagnostics received from Dr. Quagliari, dated July 20, 2010; medical records from Dr. Morgan through July 6, 2010; medical records/diagnostics from Dr. Green and APN Murphy through April 21, 2011; Hartford MCM's assessment, dated May 20, 2011; Correspondence received from Dr. Green's office, dated June 15, 2011; and Hartford RCM's assessment, dated June 28, 2011. AR 000077–81. Although the letter references the fact that Hertz was receiving SSD benefits and cites the differing standards governing public and private benefits, Hartford did not explain how or why it reached a different conclusion regarding Hertz's disability status. AR 000078. Rather, the termination letter merely includes the standardized language that Hartford requires when terminating a claim after SSD benefits have been awarded. *See* Doc. # 52, Ex. 1, Hartford 0000210.

## C. Hertz's Appeal of Hartford's Denial

On July 10, 2011, Hertz notified Hartford of her intention to appeal Hartford's decision to terminate her LTD benefits. AR 000085–87. Therein, Hertz also contested Hartford's reasons for terminating her benefits. AR 000085–87. On August 26, 2011, Hertz sent another letter, addressed specifically to Investigative Specialist Gaston, informing Hartford of her official request for an appeal. AR 000186. The letter enclosed a Renown Rehabilitation Therapy Evaluation, dated July 18, 2011 (AR 000187–188); a letter from Dr. Green acknowledging his prior statement that Hertz "could have a sedentary job," but stating that upon review of her case, Hertz "is COMPLETELY unable to work in any type of work," dated July 29, 2011 (AR 000189); an office visit report from Dr. Green indicating that "although

[Hertz] could do [a sedentary job] for a day or two she could never do this on a daily basis and she is unable to maintain any type of employment due to her disability," and further diagnosing chronic back pain, lumbar spinal stenosis cervical disc disease with myelopathy, lumbar disc disease, depression, neuropathy, and insomnia, dated July 29, 2011 (AR 000190–194); and an Outpatient Referral Form to Neurology (AR 000195). On August 31, 2011, the Appeal Unit at Hartford sent a letter to Hertz confirming receipt of her appeal and informing her that Hartford maintains a separate Appeal Unit for the consideration of claims that have been denied by the Claims Department, and that Appeal Specialist Joye Kelly would be reviewing her claim file and all documents relevant to it. AR 000066. On September 15, 2011, Hertz sent a fax to Investigative Specialist Gaston enclosing her most recent MRI and x-ray results taken on September 8, 2011. AR 000175–180.

On September 13, 2011, Hartford sent a referral to MLS Group of Companies, Inc. ("MLS") with the following instructions:

Please review the medical information. Contact the claimant's treating physicians to clarify Ms. Hertz medical status and function, then provide your opinion of his/her work capacity in terms of Dept. of Labor work category on a full time basis as of 7/1/11 to the present. Please include any appropriate restrictions/limitations. Please provide specific medical documentation that would support your opinion and rationale as well as asking the treating physicians for functional restrictions/limitations and to cite specific findings on physical/clinical (testing) examination that would support his/her opinion and rationale as well.

AR 000180–185. On October 7, 2011, board certified neurologist, Dr. Choon Rim, provided an "independent peer re-

view" of Hertz's condition and functional capacity. AR 000153–162. In making his assessment, Dr. Rim reviewed Hertz's medical records dating back to 2007, watched the surveillance video and accompanying report, and conducted peer-to-peer discussions with Dr. Morgan, Dr. Green, and Dr. Quaglieri. AR 000153–162. While Dr. Rim acknowledged Hertz's diagnoses of "cervical disc disease with myelopathy, lumbar disc disease, depression, neuropathy and insomnia," he maintained that "the objective documentation fails to support the notion that [Hertz] is not capable of doing even sedentary work." AR 000157, 161. Dr. Rim also remarked

> Both Drs. Morgan and Green feel that the claimant is not capable of doing any work because of severe pain; however, MRIs, EMGs and neurological examinations have not shown any significant anatomical lesions to cause neuropathy, radiculopathy, or myelopathy.
>
> There is no quantified neurological examination as of late, but review of the records in the last several years and peer to peer consultation support the fact that the claimant could engage in sedentary work on a full time basis as of 07/01/11 to the present unless there has been any unexpected or drastic changes in her clinical status.

AR 000160. Dr. Morgan, Dr. Green, and Dr. Quaglieri agreed that Hertz's complaints of pain were "mostly subjective in nature," "difficult to assess [in] degree or severity . . . without objective findings to indicate any underlying disease process to cause pain," and without "neurologic explanation." AR 000157–159. Nevertheless, Dr. Morgan concluded that Hertz was "totally disabled," and recommended a Functional Capacity Evaluation ("FCE"). AR 000158. Dr. Morgan had last seen Hertz in November of 2010. AR 000153. Dr. Green concluded that Hertz suffered from

"a radicular problem that probably makes [her] disabled." AR 000158. Dr. Green also concluded that "from the internal medicine point of view, [Hertz] is capable of doing sedentary work," but that Hertz "is considered unable to work." AR 000158. Dr. Green had last seen Hertz in July of 2011. Dr. Quaglieri did not comment on Hertz's functional capacity, noting that "he is not aware of [Hertz's] current status." AR 000159.

On October 31, 2011, Hartford sent a second referral to MLS specifically requesting additional documentation regarding functional restrictions or limitations and/or discussions with the treating physicians regarding functional restrictions caused by medications. AR 000148–149. On November 7, 2011, Dr. Rim sent an Addendum indicating that he had not spoken to either Dr. Morgan or Dr. Green specifically about functional impairment caused by medication, but that Dr. Quaglieri had indicated "no adverse reaction from medication." AR 000145–146.

On December 8, 2011, Hartford sent a third referral to MLS specifically requesting that Dr. Rim review the additional attached information and advise whether it would change his prior opinion of Ms. Hertz's ability to work. AR000115–116. On December 15, 2011, Dr. Rim sent an Addendum based on updated medical records from Dr. Morgan and Dr. Quaglieri. AR 000109–112. Specifically, Dr. Rim cited medical records from Hertz's October 21, 2011 visit to Dr. Morgan. AR 000110. Dr. Morgan opined that Hertz "could be active up to four hours a day with frequent breaks and she could sit for maximum of one hour, and walk for about 20 minutes, and she could do maybe two days' work out of a week." AR 000110. Dr. Rim also cited medical records from Hertz's October 27, 2011 visit to Dr. Quaglieri, at which

time he evaluated her for possible neuropathy. Dr. Quaglieri believed that Hertz suffered from chronic pain syndrome. AR 000110. An EMG/nerve condition study "did not show the peripheral neuropathy, but [did reveal] chronic L5–S1 radiculopathy, left greater than right." AR 000110. Dr. Quaglieri opined that Hertz "needed treatment of her chronic pain issues due to her chronic bilateral radiculopathies." AR 000110. Dr. Rim concluded that the additional medical documentation did not change his previously expressed opinion. AR 000111. Notably, Dr. Rim stated:

> [I]t appears that most of [Hertz's] symptoms are self-reported pain, which cannot be objectively assessed except for regular chronic lumbosacral radiculopathy with minimal objective findings to support this.

AR 000111. Finally, Dr. Rim maintained his opinion as to Hertz's functional capacity (i.e., her ability to work at a sedentary job on a full-time basis as of 7/01/11). AR 000111. Dr. Rim did not conduct a peer-to-peer review with either Dr. Morgan or Dr. Quaglieri at that time. AR 000109–112.

On January 10, 2012, Appeal Specialist Kelly notified Hertz of Hartford's decision to uphold the termination of her LTD benefits. AR 000069–72. The letter states:

> Based on our review of the totality of the information presented, and the consideration of your treating physician's opinions, along with the review and opinion conducted by the Medical Consultant, we do not disagree that you may have ongoing chronic pain symptoms. You have some minimal objective findings on physical/clinical (testing) examinations; however, the evidence does not support that you have any functional impairment that would preclude you from performing alternative sedentary work activity.

AR 000071. The letter also provides:

> Both Drs. Morgan and Green stated that you were not capable of doing any kind of work because of pain and lack of endurance for sustained physical activity; however, Dr. Rim's opinion of the medical records reviewed did not show any clinical evidence to support that you are not capable of doing even sedentary work.

AR 000070. The letter references the updated medical records and diagnoses from Dr. Quaglieri without detailing or crediting his clinical findings. AR 000070.

Again, the letter provides the standardized language that Hartford requires when terminating a claim after SSD benefits have been awarded. AR 000071. The letter further explains that, unlike the Social Security Administration ("SSA"), Hartford is not required to give special weight to the opinion(s) of a treating physician, and goes on to state that Hartford generally conducts follow-up disability reviews more frequently than the SSA. AR 000071. While the letter states that Hartford "carefully considered all relevant medical, vocational, and other evidence, including any SSA determinations or materials provided and received and requested at the appeal level," the letter is largely devoid of any specifics as to how or why it reached a different conclusion regarding Hertz's disability status. AR 000071–72. Hartford also advised Hertz that she had exhausted her administrative remedies under ERISA and that she was entitled to bring a civil action under Section 502(a) of ERISA. AR 000071. The present action ensued.

## III. Standard of Review

Where, as here, an ERISA plan confers discretion upon a plan administra-

tor to determine eligibility for benefits,[5] the Court shall review the administrator's decision to deny benefits for an abuse of discretion. *Nolan v. Heald College*, 551 F.3d 1148, 1153 (9th Cir.2009) (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006)). In *Salomaa v. Honda Long Term Disability Plan*, the Ninth Circuit explained that "the test for abuse of discretion . . . is whether [the Court is] left with a definite and firm conviction that a mistake has been committed." 642 F.3d 666, 676 (9th Cir.2011) (internal quotation marks omitted). In so determining, the Court considers whether an administrator's benefits determination was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks omitted).

■ However, it is undisputed in this case that, as an entity that both determines eligibility for benefits and pays benefit awards, Hartford operates under a "structural conflict of interest." *See Abatie*, 458 F.3d at 965 ("an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest"). Under these circumstances, "[s]imply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir.2009). As such, the Court "must weigh the conflict as a *factor* in determining whether there is an abuse of discretion." *Nolan*, 551 F.3d at 1153 (quoting *Metro. Life Ins. Co. v. Glenn*, 554

U.S. 105, 111, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)) (internal quotation marks omitted); *but see Salomaa*, 642 F.3d at 674 (explaining that while a conflict of interest must be weighed as a factor, it does not have the effect of converting abuse of discretion review into *de novo* review).

■ "[T]he extent to which a conflict of interest appears to have motivated an administrator's decision is one among potentially many relevant factors that must be considered." *Montour*, 588 F.3d at 630. "Other factors that frequently arise in the ERISA context include the quantity and quality of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any." *Id.* (internal quotation marks omitted). The weight assigned to the conflict factor, as well as "the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision," depend on the facts and circumstances of each particular case. *Id.* at 630–31; *see also Nolan*, 551 F.3d at 1153 (in weighing a conflict of interest, the court may "consider evidence outside the administrative record to decide the conflict's nature, extent, and effect on the decisionmaking process") (internal quotation marks omitted). "If [the] facts and circumstances indicate the conflict may have tainted the entire administrative decision-making [sic] process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to

---

**5.** The parties agree that "Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret

the terms and provisions of the LTD Plan." Doc. # 10, ¶ 14; Doc. # 11, ¶ 14.

assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred." *Id.* at 631. More specifically, "[the] court may weigh a conflict more heavily if, for example, [1] the administrator provides inconsistent reasons for denial; [2] fails adequately to investigate a claim or ask the plaintiff for necessary evidence; [3] fails to credit a claimant's reliable evidence; or [4] has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Abatie,* 458 F.3d at 968–69 (internal citations omitted).

██ The Court is keenly aware of the conflicting standards under which the parties have brought their respective Motions. In an ERISA case, such as this, the Ninth Circuit has held that "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir.1999). However, *"Bendixen* predated *Abatie* and its requirement that any conflict [of interest] always be considered[.]" *Nolan,* 551 F.3d at 1154. Rather, it "applied an abuse of discretion standard untempered in any way, and did not involve a case where the district court examined evidence outside of the administrative record." *Id.* Whereas here, a court must consider evidence outside of the administrative record, namely evidence related to an alleged conflict of interest, the traditional rules of summary judgment apply (e.g., the requirement that evidence be viewed in the light most favorable to the non-moving party). *See id.* (finding error where the district court weighed the documentary evidence of bias and ignored the protections that summary judgment usual-

ly affords the non-moving party, but also noting that the district court could have properly weighed such evidence after a bench trial). Because a bench trial will ensure that the Court has an opportunity to conduct a full conflict of interest inquiry and weigh such evidence in determining the precise contours of the abuse of discretion standard, the Court finds that judgment on the merits pursuant to Federal Rule of Civil Procedure 52 is the appropriate standard under which to review Hartford's decision to terminate Hertz' LTD benefits.

## IV. Conclusions of Law

### A. Hartford's Conflict of Interest

██ While Hartford acknowledges that there is structural conflict of interest, it disputes the extent to which the Court should consider it as a factor in determining whether it abused its discretion in denying Hertz's LTD benefits. Indeed, the weight given to a conflict of interest will be less important, "perhaps to the vanishing point," where the claims administrator "has taken active steps to reduce potential bias and to promote accuracy." *Glenn,* 554 U.S. at 117, 128 S.Ct. 2343. Such steps include separating claim examiners from those interested in the company's finances, evaluating employees without consideration of numbers of claims approved or denied, imposing management checks to penalize inaccurate decision making, providing each claimant with an individualized and independent review, and separating the appeals unit form those who make initial claims determinations. *See id.*

██ Hartford contends that because it took active steps to minimize its conflict, the conflict should not weigh heavily in the Court's analysis. In support thereof, Hartford submitted a Declaration by Bruce Luddy, Director of Litigation and

Appeals. *See* Doc. # 50, Ex. A. However, Hertz points out that in Hartford's initial disclosures, it did not identify Luddy as a potential witness or as someone with relevant knowledge in accordance with Federal Rule of Civil Procedure 26(a). *See* Doc. # 57, Ex. 1. Nor did Hartford supplement its initial disclosures upon learning of the "additional or corrective information [that had] not otherwise been made known to the other parties" in accordance with Federal Rule of Civil Procedure 26(e). Rule 37(c) provides that if any party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion [or] at a hearing ... unless the failure was substantially justified or is harmless." Fed. Rule Civ. Proc. 37(c).

Here, Hartford's failure to disclose Luddy as a potential witness or as someone with relevant knowledge is neither harmless nor justified. *See Langston v. N. Am. Asset Dev. Corp.*, No. C 08–02560 SI, 2009 WL 941763, at *6 (N.D.Cal. April 6, 2009) (disregarding Luddy's declaration in its analysis of Hartford's structural conflict where Hartford's failure to disclose Luddy as a potential witness was neither justified nor harmless). Hartford's contention that its failure to disclose Luddy was harmless and not prejudicial because it disclosed as a potential witness the "Person Most Knowledgeable at Hartford" is entirely unavailing. *See* Doc. # 58, p. 9. Had Hertz known that Hartford planned to introduce evidence of the measures it had taken to mitigate its structural conflict of interest, Hertz could have propounded discovery on that issue and could have deposed Luddy. Moreover, in light of Hartford's repeated reliance on an affidavit or declaration of Luddy to evidence the minimization of its conflict of interest in a number of cases since *Glenn* in 2008,[6] the Court finds it highly unlikely that Hartford's omission in this regard was inadvertent. Accordingly, the Court shall not consider Luddy's declaration in evaluating the impact of Hartford's structural conflict of interest.

█ Nevertheless, even if the Court were to consider Luddy's declaration that "Hartford does not provide Investigative Specialists, Claims Specialists, or Appeals Specialists with incentives, remuneration, bonuses, awards, achievements or other recognition based in whole or in part upon the denial or termination of claims," the Court finds that there is significant evidence that undermines his claim. Hertz presented evidence that, even if Hartford does not explicitly tie administrators' remuneration to denial or termination of claims, its employees are acutely aware that Hartford evaluates them on that basis. Specifically, Hertz proffered evidence that Hartford evaluates its employees according to their ability to deny and terminate claims. *See* Doc. # 52, Ex. 8 (commending employee for "striving to eliminate non-standard claim files"). Additionally, Investigative Specialist Gaston, who terminated Hertz's claim, was specifically evaluated on her ability to close claims. *See* Doc. # 57, Ex. 3, p. 0001 (remarking that "[Gaston] maintained a very high case intake and closed a high number of total cases, while demonstrating a solid overall level of Case quality"). Hertz also proffered evidence that Hartford evaluates its employees on how frequently they make referrals to SIU. *See*

---

**6.** *See Langston*, 2009 WL 941763; *Brown v. Hartford Life Ins. Co.*, No. 06–CV–115–JHP, 2010 WL 3649521 (E.D.Okla. September 14, 2010); *Bender v. Hartford Life Ins. Co.*, No. C 09–01163 MMC, 2011 WL 3566483 (N.D.Cal. Aug. 12, 2011); *Mugan v. Hartford Life Ins. Co.*, 765 F.Supp.2d 359 (S.D.N.Y.2011); *Wright v. Hartford Benefit Mgmt. Servs.*, No. 11–602(FSH)(MAH), 2012 WL 1680094 (D.N.J. May 11, 2012).

Doc. # 52, Ex. 6, p. 0024 (referencing Hartford's initiative in response to a decrease in referrals in 2010, the goal of which is to increase direct referrals to SIU); *see also* Doc. # 52, Ex. 7, p. 0004 (citing Hartford's goal of one referral to SIU per month and commending employee for utilizing "cost containment programs"). Hartford also evaluates its employees on their successful referrals to MCM. *See* Doc. # 57, Ex. 3, p. 0001 (citing rejected referrals as slightly higher than average and noting a lack of significant surveillance activity as the cause for rejection); *see also* Doc. # 57, Ex. 3, p. 0013 (noting that "1 medical referral pended and 3 referrals rejected was below unit & peer average"). Accordingly, the Court finds that there is sufficient evidence from which to infer that Hartford employees are aware that their performance is evaluated on the basis of certain metrics which incentivize claim denial or termination.

Likewise, even if the Court were to consider Luddy's declaration that "the individual responsible for the appeal does not discuss the merits of the claim with the Investigative Specialist who makes the initial benefits determination, or the Claim Specialist who approved the determination," Hertz presented evidence that Hartford's appeal unit is not entirely "walled off" from those individuals that made the initial claim determination. First, Kelly, the Appeal Specialist assigned to handle Hertz's appeal, works in the very same office as Gaston, the Investigative Specialist assigned to handle Hertz's initial claim determination. *See e.g.*, AR 000068, 171 (documenting the fact that both Kelly and Gaston work in the Maitland, Florida Office). Second, Luddy is employed by Hartford in Connecticut, and thus has no personal knowledge as to whether the above-mentioned policy is faithfully observed. *See* Doc. # 50, Ex. A, ¶ 2. Thus,

even if Hartford has such a policy in place, as Luddy declares, the Court is somewhat skeptical about the extent to which the said policy is implemented in practice. In light of the aforementioned evidence, the Court concludes that even if Hartford adopted policies and procedures to reduce the impact of its structural conflict of interest, they do not effectively eliminate the existence of the conflict. *See Bender*, 2011 WL 3566483, at *12 (concluding that even where Luddy's declaration demonstrates that Hartford has taken steps to reduce bias and promote accuracy, "such procedures do not serve to wholly eliminate the existence of conflict").

In *Caplan v. CNA Financial Corporation*, the district court looked not only to Hartford's conflict of interest, but also considered Hartford's reliance on vendors it knew benefitted financially from repeat business. 544 F.Supp.2d 984, 991–93 (N.D.Cal.2008). The court noted that Hartford knew that the vendors had "an incentive to provide it with reports that [would] increase the chances that Hartford [would] return to [them] in the future—in other words, reports upon which Hartford may rely in justifying its decision to deny benefits to a plan participant." *Id.* at 991–92. Similarly, here, the Court finds that Hartford relied on vendors—namely HUB and MLS—that it knew had an incentive to provide it with reports in favor of terminating Hertz's LTD benefits.

As to HUB, the Central District of California recently found that "HUB has strong financial ties" to Hartford. *Kurth v. Hartford Life and Acc. Ins. Co.*, 845 F.Supp.2d 1087, 1097 (C.D.Cal.2012). Here, Hartford does not dispute that HUB has strong financial ties to Hartford. As such, the Court finds it at least plausible that these financial ties incentivized HUB to record those portions of Hertz's activity that most convincingly portrayed her as a

non-disabled person capable of fulltime sedentary work. Additionally, the HUB investigator's comment that "[Hertz] appeared to ambulate in a normal manner, without restrictions," when the video surveillance clearly depicts the fact that Hertz experienced difficulty walking and engaging in other activities, indicates that the HUB investigator skewed his accompanying report in order to provide Hartford with a certain desired result. *See* AR 000292; *see also* Doc. # 48, App. Vol. VI of AR. Finally, as the Court will later explain, the significance of HUB's mischaracterization of Hertz's functionality cannot be understated given that the surveillance video strongly influenced every step of the entire administrative decision-making process which led to the termination of Hertz's benefits.

Likewise, the nature of Hartford's relationship with MLS and their reviewing physicians creates an incentive for MLS to reach results that are favorable to Hartford in order to foster and sustain their business relationship. Significantly, between January 2010 and November 6, 2012, MLS conducted 752 medical reviews for Hartford. *See* Doc. # 52, Ex. 2 at 4:15–20. In a sampling of 75 of those medical reviews, only four (4) were determined to be completely unable to work. Doc. # 52, Ex. 3 at 4:4–6. Accordingly, MLS found that approximately 95% of all claimants could perform some type of work. During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford. Doc. # 52, Ex. 4 at 2:24–25. Significantly, of those fourteen (14) claims reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work. Doc. # 52, Ex. 4 at 3:20–22. Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work. *See Montour*, 588 F.3d at 634 (noting relevance of statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in that case to the issue of bias).

 In sum, Hartford's own structural conflict of interest, as well as its reliance on biased vendors, persuade the Court to review Hartford's decision to terminate Hertz's LTD benefits with significant skepticism. Moreover, it can be reasonably inferred from the following circumstances that Hartford's bias infiltrated the entire administrative decision-making process.[7] Accordingly, the Court shall weigh Hartford's conflict of interest more heavily. *See Glenn*, 554 U.S. at 117, 128 S.Ct. 2343 (considering a conflict of interest to be of great importance "where circumstances suggest a higher likelihood that it affected the benefits decision"); *see also Montour*, 588 F.3d at 634; *Kurth*, 845 F.Supp.2d at 1097.

## B. Quantity and Quality of Medical Evidence

### 1. Hartford Overstated and Over-Relied on the Surveillance Video of Hertz

 Like the district court in *Montour*, the Court finds that throughout the

---

7. The Court rejects Hartford's assertion that there must be a causal relationship between an administrator's conflict of interest and the decision-making process in Hertz's claim. *See* Doc. # 55, pp. 6–7. In *Montour,* the Ninth Circuit clarified that the court's review is informed by the extent to which a conflict *may have* tainted the entire administrative decision-making process. 588 F.3d at 631; *see also Kurth*, 845 F.Supp.2d at 1098 (concluding that claimant need not demonstrate a causal relationship between the structural conflict of interest inherent in an insured plan and the decisions reached).

record, "Hartford overstates and over-relies on [the video] surveillance of [Hertz]." 588 F.3d at 633. While Hartford hired HUB to conduct forty (40) hours of surveillance over four (4) days in December 2010, HUB only returned approximately eleven (11) minutes of footage depicting Hertz's activities during that time period. Again, "Hartford strung together a laundry list of discrete activities observed over the course of four days, suggesting that [Hertz] was capable of sustaining those activities throughout the day, as would be required in a sedentary occupation." *Id.; see also* AR 000078 (noting that HUB observed Hertz "actively engaging in the following activities: operating a motor vehicle, carrying items, shopping, bending, and standing/walking in an unrestricted matter[,] . . . visiting a Wal–Mart, private residence, and Jim's Doggie Diner[,] . . . and staying at Jim's Doggie Diner for prolonged periods"). However, the fact that HUB happened to capture discrete moments during which time Hertz was performing activities consistent with her self- and physician-reported restrictions does not provide support for Hartford's conclusion that she was capable of performing full-time sedentary work. *See Montour,* 588 F.3d at 633 ("that [a claimant] could perform sedentary activities in bursts spread out over four days does not indicate that he [ ] is capable of sustaining activity in a full-time occupation").

Also detrimental to Hartford's conclusion that Hertz's "observed activities of daily living [ ] provide[d] a picture of function in spite of any medical condition(s)" is the fact that the surveillance video does not in fact amount to a picture of function sufficient to support the conclusion that Hertz is capable of doing full-time sedentary work. Moreover, contrary to Hartford's assertion that the surveillance video depicted "inconsistencies with respect to [Hertz's] current level of function," the

Court finds that the surveillance video evidences a level of function that is entirely consistent with Hertz's own self-reported limitations. *See* AR 000287–289 (Hertz admitting that she could independently and without the use of special equipment walk slowly for 15–20 minutes; stand for 15–20 minutes; perform all of her own shopping; lift and carry items weighing between 5 and 10 pounds; push and pull things that require slight resistance; reach to her front, sides, and below her waist; walk up and down stairs and steps using a handrail; write and type for 3–5 minutes; read without restriction; drive short distances in her community; sit for approximately 20–30 minutes at a time; and dress and perform her own personal hygiene). Moreover, the video surveillance is entirely consistent with Dr. Morgan's characterization of her level of function. *See* AR 000110 (opining that Hertz "could be active up to four hours a day with frequent breaks and she could sit for [a] maximum of one hour, and walk for about 20 minutes, and she could do maybe two days' work out of a week").

Furthermore, the Court finds that Hartford's over-reliance on the skewed surveillance video and accompanying report infiltrated the whole claims review process. First, Hartford Nurse Cobb, who did not evaluate Hertz in person, overstated the extent to which the surveillance video evidenced Hertz's level of function. Specifically, Nurse Cobb noted that "[s]he did not display any noticeable limitations or restrictions." AR 000502. Moreover, Nurse Cobb noted that "[Hertz] was observed up to 6 hours in 1 day at Doggie Diner." AR 000502. These "observations," however, are problematic because they mischaracterize the value of the surveillance. First, HUB only obtained one minute and thirteen seconds of video on that date. *See* AR 000304. Second, HUB's accompanying

report for the day fails to indicate the type of activities in which Hertz was engaged. *See* AR 000304. Thus, Nurse Cobb's suggestion that Hertz was working at the Diner for six hours in one day is highly suspect.

Second, the Court finds that Hartford's initial attempt to obtain Dr. Green's family practice perspective as to Hertz's maximum level of function was "marred by this overstatement of the surveillance findings, as well as the apparent advocacy of the position that [Hertz] was not disabled." *Montour*, 588 F.3d at 633; AR 000218. In response to the letter, Dr. Green checked a box, agreeing that "from a Family Practice perspective" Hertz had the ability to engage in full-time sedentary work. AR 000218. First, the fact that Hartford couched its inquiry in terms of a "Family Practice perspective" indicates that Hartford did not want Dr. Green to consider Hertz's neurological condition in making his determination. Second, as a family physician, Dr. Green is apparently less familiar with Hertz's neurological condition and was perhaps more apt to be swayed by Hartford's slanted presentation of the facts via the surveillance video.

Finally, the fact that Dr. Rim relied on the surveillance video to assess Hertz's functionality instead of conducting an in-person evaluation is troubling. Given that he also only reviewed the eleven-minute video segment and HUB's accompanying report, the Court finds his assessment that Hertz engaged in "various activities ... quite normally" to be equally unpersuasive. *See* AR 000157 (reviewing the surveillance video and report provided by Hartford).

## 2. Hartford and Dr. Rim Arbitrarily Discredited Dr. Morgan, Dr. Green, and Dr. Quaglieri's Reliable Medical Opinions

Although Hartford was not required to accord special weight to the opinions of Hertz's treating physicians, the Court finds that it was improper for Hartford to discredit Dr. Morgan, Dr. Green, and Dr. Quaglieri's opinions regarding Hertz's diagnoses and functional capacity in the absence of reliable evidence to the contrary. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (holding that while "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician," "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician"). Here, the record clearly demonstrates that Hartford and Dr. Rim gave only minimal consideration, if that, to Dr. Morgan, Dr. Green, and Dr. Quaglieri's medical opinions. Specifically, neither Hartford nor Dr. Rim ever indicated whether Dr. Green's diagnoses of chronic back pain, lumbar spinal stenosis, cervical disc disease with myelopathy, lumbar disc disease, depression, neuropathy, and insomnia, and Dr. Quaglieri's diagnoses of chronic pain syndrome and chronic bilateral radiculopathies were correct. Nor did they opine as to whether or to what extent those diagnoses would affect Hertz's functional limitations. Moreover, despite their brief mention in the appeal letter, Hartford appears not to have considered Dr. Quaglieri's updated records with objective findings of Hertz's impairment to any significant degree.

Rather, Dr. Rim simply concluded that Hertz was capable of performing full-time sedentary work because her pain symptoms could not be "objectively assessed except for regular chronic lumbosacral radiculopathy with minimal objective findings to support this." AR 000111. Similarly, Hartford cited the absence of "any

clinical evidence to support that [Hertz is] not capable of doing even sedentary work" as the basis for its denial of benefits. AR 000070. However, despite conclusory references to the absence of objective medical data, Hartford failed to identify specific parts of the medical record that refute Hertz's treating physician's diagnoses and functional capacity assessments. In fact, the record is devoid of any reliable evidence tending to cast doubt on Dr. Morgan and Dr. Green's medical opinions that Hertz is incapable of working a full-time occupation. Accordingly, the Court finds that Hartford arbitrarily, and thus improperly, discredited Hertz's reliable evidence, including the opinions of Dr. Morgan and Dr. Green as to her functional capacity, and the opinions of Dr. Green and Dr. Quaglieri as to her medical diagnoses.

### 3. Hartford Improperly Based Its Determination on the Lack of Objective Medical Evidence

Here, Hartford's denial of benefits on appeal was based primarily on Dr. Rim's report, which found only minimal objective evidence to support Hertz's subjective complaints of pain. However, Hartford's apparent objective evidence requirement is inconsistent with the terms of the Plan, which never details such a requirement. *See* AR 000018 (stating only that Hartford "reserves the right to determine if your proof of loss is satisfactory"). Thus, contrary to Hartford's assertion in its Motion for Summary Judgment, a claimant is not required to give objective proof in order to prove disability. *See* Doc. # 50, p. 21 (arguing that "[i]n order to prove disability, a claimant must give objective proof that they are disabled, for 'the very concept of proof connotes objectivity' ") (quoting *Maniatty v. UNUM Provident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y.2002)). In *Mitchell v. Metropolitan Life Insurance Company*, the district court found that an

administrator cannot deny a claim based upon a lack of objective evidence where that standard was not expressly articulated in the Plan, even where the Plan conferred discretion upon the administrator to determine eligibility for benefits. 523 F.Supp.2d 1132, 1146 (C.D.Cal.2007) (citing *Canseco v. Constr. Laborers Pension Trust for So. Cal.*, 93 F.3d 600, 608 (9th Cir.1996) (holding that administrators "may not construe a plan so as to impose an additional requirement for eligibility that clashes with the terms of the plan")). The Ninth Circuit agreed that the Plan administrator had abused is discretion in denying the claimant's disability claim "on the basis of 'an unwritten and unexplained objective evidence requirement' not specified within its policy." *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 (9th Cir.2010) (internal citations omitted). Because there is no explicit, or even implicit requirement that a claimant produce objective proof of his or her disability, the Court finds that it was improper for Hartford to base its denial of benefits on Dr. Rim's assessment that there was only minimal objective evidence to support Hertz's claims of chronic pain.

Even more problematic is the fact that Hartford's own Claims Manual further recognizes that "[s]ubjective complaints frequently contribute to an individual's functional status and we must also take these complaints into consideration when evaluating a claim for disability benefits." Doc. # 52, Ex. 1, p. 0001247, 1384. Likewise, the APS that Hartford sent to Hertz's treating physicians asked them specifically to identify "Current Subjective Symptoms." AR 000408. Thus, Hartford's obvious disregard for Hertz's subjective complaints of pain is contrary to its own internal policy. Finally, this is not a case in which Hertz's "significant subjective complaints" are "grossly disproportionate"

to the objective findings, such that Hartford would have been justified in discrediting the former. Rather, Hertz's subjective complaints are exactly in line with the uncontradicted medical opinions of her treating physicians.

Hartford's insistence on objective evidence is also problematic because medical conditions such as chronic pain syndrome may not be amenable to objective verification. *See*, e.g., *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872–73 (9th Cir.2008) (holding that "individual reactions to pain are subjective and not easily determined by reference to objective measurements"). Here, Hartford and Dr. Rim failed to discuss whether or to what extent Hertz's self-reported symptoms were disabling. Instead, Hartford and Dr. Rim discredited and dismissed Hertz's subjective evidence of pain without explanation. Dr. Rim noted some restrictions and limitations, but concluded that Hertz's "sitting is unrestricted." AR 000160. In the appeal letter, Hartford conceded that Hertz "may have ongoing chronic pain symptoms," but concluded that she did not "have any functional impairment that would preclude [her] from performing alternative sedentary work activity." AR 000071. However, these assessments are directly in conflict with Hertz's subjective complaints of pain and her physicians' functional assessment thereof.

If Hartford had serious doubts about the physical limitations imposed by Hertz's symptoms (i.e., doubts about Hertz's subjective reports of pain and her treating physicians' functional assessments), it should have sought an in-person medical evaluation (IME) or an independent functional capacity evaluation (FCE). The Court addresses Hartford's failure to obtain an IME or FCE in greater detail in the following section. Alternatively, if Hartford felt that the medical records were insufficient to verify Hertz's disability, it was incumbent upon Hartford to inform Hertz of the deficiency so that she might proffer any additional needed documentation. *See Montour*, 588 F.3d at 635 (finding that where the record is insufficient to make a disability determination, the plan administrator has a duty to inform the claimant of the deficient record and provide an opportunity to furnish the missing information). However, Hartford never offered any guidance as to what type of "objective" evidence would be sufficient to corroborate Hertz's subjective complaints of pain.

Finally, the Court disagrees with Dr. Rim's assessment that there was only minimal objective medical data to support Hertz's alleged pain levels. In *Montour*, the Ninth Circuit found that "[i]t would probably have been unreasonable for Hartford to require the claimant to produce objective proof of his pain level, per [his treating physician], or to reject his subjective claims of 'excess pain' based solely on [his reviewing physician's] observation." 588 F.3d at 635. However, the Ninth Circuit went on to conclude that evidence of the claimant's relatively mild pain medication and lack of engagement in any pain treatment programs was sufficient "objective" evidence to support the conclusion that the claimant's pain did not rise to a level of disabling pain. *Id.* In contrast here, there is ample "objective" evidence in the record to substantiate Hertz's claims of disabling pain. *See* AR 000191–193 (Dr. Green listing current patient prescriptions, including Gabapentin up to 6 times per day for pain, Norco 4–5 times daily for pain and "occasionally she has had to take 11/2 meds at a time," and Baclofen to minimize the number of severe spasms); *see also* AR 000190 (Dr. Green noting hospitalization for severe spasm episode, during which patient received "IV

valium X2"); *see also* AR 000156 (Dr. Rim noting Hertz's hospitalization on 04/21/11 "for an episode of acute pain in both upper and lower spine").

Lastly, but of equal significance, is the fact that Hartford previously determined that Hertz was disabled and paid her LTD benefits until July 2010 on the basis of the same allegedly non-objective medical evidence. *See Kurth*, 845 F.Supp.2d at 1101 (finding abuse of discretion where administrator failed to explain why a treating physician's diagnosis was sufficient to grant benefits for a time but was completely unacceptable once the investigation began). Here, Hartford terminated Hertz's benefits without any showing that her condition had materially improved. Rather, the only change appears to be the extent to which Hartford credited Hertz's medical evidence. There is simply no indication as to why her treating physician diagnoses and functionality assessments were sufficient to grant her LTD benefits for a time, but were no longer acceptable once her case had been referred to SIU.

### C. Whether the Plan Administrator Subjected the Claimant to an In–Person Medical Evaluation or Relied Instead on a Paper Review of the Claimant's Existing Medical Records

According to the unequivocal language in the Plan, Hartford may conduct an IME to determine disability. *See* AR 000018. Likewise, the Hartford Claims Manual specifically provides that "[i]f the claimant's [attending physician(s)] continue to support the claimant's disability status, an IME or FCE should be arranged." Doc. # 52, Ex. 1, Hartford 0000523. The Hartford Claims Manual also provides that an IME, FCE, or independent medical review of the records "must be done in order to make a claim determination ... [w]hen,

the limitations noted by the attending physician remain inconsistent with diagnostic study results or medical records, and/or ... to resolve legitimate conflicting opinions between the claimant's treating/examining physicians and our own MCM staff." Doc. # 52, Ex. 1, Hartford 0001248.

Here, instead of arranging for an FCE, as recommended by Dr. Morgan, or conducting an IME to ensure an accurate assessment of Hertz's functional capacity, Appeal Specialist Kelly relied on the eleven-minute surveillance video that supposedly depicted Hertz engaging in "activities of daily living which provide[d] a picture of function in spite of any medical condition(s)," and Dr. Rim's identical assessment of the same. AR 000072. Similarly, Dr. Rim did not examine or even speak to Hertz in rendering his opinions. Indeed, "the fact that a video surveillance was conducted in lieu of an IME raises legitimate questions concerning the thoroughness of the investigation." *Kurth*, 845 F.Supp.2d at 1097 (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (holding that the failure to conduct a physical examination may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination)). Here, the absence of an FCE or IME is even more troubling in light of the fact that both Dr. Morgan and Dr. Green, the only two physicians who had evaluated Hertz's functional capacity in person in the latter part of 2011, strongly opined that she was not capable of doing any type of full-time work due to chronic pain. While the Court recognizes that there is nothing procedurally improper about the use of surveillance, an FCE or IME certainly "would have yielded [ ] a more complete assessment of [Hertz's] capacity and limitations." *Kurth*, 845 F.Supp.2d at 1097; *Salomaa*, 642 F.3d at 674 (noting that "[a]n insurance company may choose to avoid an [IME] because of the risk that

the physicians it employs may conclude that the claimant is entitled to benefits"). Hartford's failure to conduct an IME or FCE weighs strongly in favor of finding that it abused its discretion in terminating Hertz's LTD benefits. *See Kroll v. Kaiser Found. Health Plan Long Term Disability Plan,* No. C 09–01404 JSW, 2011 WL 1225737, at *6 (N.D.Cal. Mar. 31, 2011) (finding that plan administrator abused its discretion, in part because its doctors did not conduct an in-person examination of the claimant).

### D. Whether the Administrator Provided its Independent Experts with All of the Relevant Evidence

Here, while Dr. Rim stated that "[a]ll records provided by The Hartford were reviewed[,]" there is no indication as to whether he was provided with or whether he reviewed the SSA's contrary disability determination. *See Montour,* 588 F.3d at 634 (Hartford's professional experts only mentioned the SSA's contrary conclusion, "not even to discount or disagree with it, which indicates that [they] may not even have been aware of it") (internal quotation marks omitted). Because the record is entirely devoid of any documentation related to the SSA's determination of disability, and because Dr. Rim did not specifically cite to any SSA records in his written review, the Court shall infer that he was not provided with such documentation.

### E. Whether the Administrator Considered a Contrary SSA Disability Determination

Finally, the Court considers Hartford's failure to discuss the SSA's disability determination. The letter denying Hertz's appeal merely pays lip service to the existence of a contrary SSA disability determination and further explains two discrete differences between the SSA and Hart-

ford's review process. However, it did not discuss, cite to, or weigh the findings by the SSA or differentiate those findings from Hartford's determination to deny benefits. "Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." *Id.* at 636. As previously noted, the record does not contain the opinion of the SSA administrative law judge or the SSA administrative record, as was also the case in *Montour.* Accordingly, the Court finds that the record was insufficient to properly consider and discuss the SSA's differing disability determination. *See id.* (finding that where the record is insufficient to make a disability determination, the plan administrator has a duty to inform the claimant of the deficient record and provide an opportunity to furnish the missing information).

"While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" *Montour,* 588 F.3d at 635 (citing *Glenn v. MetLife,* 461 F.3d 660, 674 (6th Cir.2006), aff'd by *Glenn,* 554 U.S. 105, 128 S.Ct. 2343). Here, there is certainly evidence that Hartford's adverse benefits determination was the product of a principled and deliberative reasoning process. Specifically, that Hartford did not distinguish between its own disability determination and that of the SSA is significant because the SSA employs a more stringent standard for determining disability than does the governing ERISA Plan. In *Montour,* the Ninth Circuit compared the very same definition of "disability" under the Plan at issue with the SSA's defini-

tion of "disability," and found that "unlike the Plan, the SSA's standard does not take into account a claimant's past earnings or location." 588 F.3d at 636. Here, as in *Montour*, "Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the administrator's decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding." *Montour*, 588 F.3d at 637; *see also Glenn*, 554 U.S. at 118, 128 S.Ct. 2343 (finding that this "course of events" was significant because it suggest procedural unfairness and also justified the court giving greater weight to the administrator's conflict because their seemingly inconsistent positions were both financially advantageous).

## V. Conclusion

Weighing all of the aforementioned factors together, the Court concludes that Hartford's conflict of interest improperly motivated its decision to terminate Hertz's LTD benefits. This constituted an abuse of its administrative discretion under ERISA. Accordingly, Hartford shall reinstate Hertz's LTD benefits in accordance with this Order and the terms of the Plan until such time as the administrator properly terminates said benefits according to the Plan's provisions. *See Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir.2008) (ERISA benefits may be reinstated if the claimant would have continued receiving benefits absent the administrator's wrongful conduct). Additionally, Hartford shall pay Hertz back benefits equal to the amount she would have received had Hartford not improperly terminated her benefits on July 5, 2011.

IT IS THEREFORE ORDERED that Hertz's Motion for Judgment Under FRCP 52 (Doc. # 52) is GRANTED.

IT IS FURTHER ORDERED that Hartford's Motion for Summary Judgment (Doc. # 50) is DENIED.

IT IS FURTHER ORDERED that Hartford shall reinstate Hertz's LTD benefits in accordance with this Order and the terms of the Plan.

IT IS FURTHER ORDERED that Hartford shall pay Hertz back benefits from the date on which her LTD benefits were terminated, including pre- and post-judgment interest.

IT IS FURTHER ORDERED that Hertz shall seek an Order awarding attorney's fees and costs in accordance with Local Rule 54–16.

IT IS SO ORDERED.

